IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| ANGELA POWERS WEST, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No.: 3:08-cv-751 MJR-DGW |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

This matter has been referred to United States Magistrate Judge Donald G. Wilkerson by United States District Judge Michael J. Reagan pursuant to 28 U.S.C. § 636(b)(1)(B), Federal Rule of Civil Procedure 72(b), and Local Rule 72.1(a) for a Report and Recommendation on the Petition for Review of the Commissioner's Decision Denying Benefits filed on October 27, 2008, by Angela Powers West ("Claimant") (Doc. 2).   For the reasons below, it is **RECOMMENDED** that Claimant's petition be **DENIED**, that judgment be entered in favor of the Commissioner, and that the Court adopt the following findings of fact and conclusions of law:

## FINDINGS OF FACT

Claimant applied for disability and disability insurance benefits on April 29, 2004 (Tr. 62-65).  Claimant was denied initially on September 9, 2004 (Tr. 46-50), and upon reconsideration on March 14, 2005 (Tr. 41-44).  Claimant filed a timely request for a hearing before an Administrative Law Judge ("ALJ") on the denials on April 11, 2005 (Tr. 39).  ALJ Kathleen Gavin held a hearing on October 24, 2007 (Tr. 1144-74).  By decision dated December 4, 2007, the ALJ found Claimant was not entitled to disability insurance benefits (Tr. 10-26).  Plaintiff requested and the Appeals

Council denied review (Tr. 2-5, 9). Thus the ALJ's decision became final. 20 C.F.R. § 416.1481. *Skarbek v. Barnhart*, 390 F.3d 500, 503 (7th Cir. 2004). Claimant now seeks judicial review of the Agency's final decision pursuant to 42 U.S.C. § 405(g).

### Claimant's Personal and Medical History

Claimant was born on April 21, 1961 (Tr. 128). She was 42 years old at the alleged onset-of-disability date of March 7, 2004 (Tr. 13, 25). Claimant has a high school education and worked consistently from 1989 to 2004 as a savings counselor at a bank, a sales agent, a correctional officer, and a food service supervisor at a correctional institution (Tr. 102-06). At the time of Claimant's alleged onset of disability, she was working for the Illinois Department of Corrections as a "Youth Supervisor II," a position involving supervision and transportation of juvenile inmates to and from the dining room, school, and gym (Tr. 104). Claimant contends that she became disabled after she was punched while attempting to break up a fight in the course of her job on October 18, 2002 (Tr. 78). She alleges the punch caused immediate neck and arm pain, as well as lasting generalized pain and fatigue (Tr. 1153).

Claimant alleges that her neck pain originated in 1985 when she was injured in a horseback-riding accident (Tr. 892). She experienced a "flare-up" from that injury after a 1996 car accident (Tr. 892). In April 1998 Dr. Prifti Sahni performed surgical fusion of the C 5-6 and C 4-5 vertebrae (Tr. 899-905). Dr. Sahni reported that Claimant was "working without difficulty" in June 1998, had only occasional discomfort in July 1998, and was "totally asymptomatic" in September and October 1998 (Tr. 887).

Claimant alleges that the 2002 punch caused her cervical pain to recur. Medical records show that Claimant sought emergency room treatment on October 18, 2002, after the punch (Tr.

1015-18).  She complained of burning neck and jaw pain (Tr. 1016).  The treating physician, Dr. McQuirter, diagnosed "acute myofascial strain" and neck pain (Tr. 1017).  He prescribed Vicodin and Soma and instructed Claimant to use cold compresses and call her primary care physician (Tr. 1017).  Dr. McQuirter ordered x-rays which revealed no acute bone abnormality, some degenerative changes at C 3-4, and prior cervical fusion at C 4-5 and C 5-6 (Tr. 1018).  Dr. McQuirter noted that the x-rays revealed normal alignment, normal soft tissues, and no fracture (Tr. 1017).

Dr. Evans, Claimant's primary care physician, ordered and Claimant received physical therapy for neck pain between December 2002 and March 2003 (Tr. 737-58).  At the end of the course of physical therapy treatment the physical therapist reported that Claimant had not met the goals for controlling her neck pain (Tr. 738).  Claimant saw Dr. Charles W. Rubright, a chiropractor, fourteen times between April 9 and May 14, 2003 for chiropractic treatments related to neck pain (Tr. 1053-61).

January 8, 2003, x-rays revealed fusion at C 4, C 5, and C 6, "fairly normal" anatomical alignment with no new fractures or dislocations, and no bone destruction or bony sclerosis.  The x-ray showed "mild anterior spurring" at the anterior inferior aspect of C 3, but prevertebral soft tissues were normal (Tr. 762).  January 27, 2003, electrodiagnostic testing was normal with no evidence of right median neuropathy at the wrist, ulnar neuropathy, or cervical radiculopathy (Tr. 364).  A February 26, 2003, x-ray showed postoperative changes at C 4-5 and C 5-6, slight straightening of the cervical lordotic curve, and findings consistent with degenerative disc disease at C 3-4 (Tr. 880).  A March 19, 2003, CT scan of the cervical spine showed cervical fusion and degenerative changes at C 3-4 and C 2-3 (Tr. 879).

On September 25 and October 8, 2003, Dr. Paul B. Juergens at Southern Illinois Pain

3

Management performed cervical epidural steroid injections (Tr. 909, 940, 1044-45). Claimant saw Dr. Miles French on October 6, 2003, for follow-up on the procedure. She reported three days of pain relief but rated her pain that day at an eight on a scale of zero (no pain) to ten (most severe pain). Dr. French noted, however, that Claimant was in "no apparent distress." Dr. French opined that Claimant could return to her job in a light duty capacity with no lifting greater than 20 lbs, no overhead lifting, and no restraining of prisoners. He further qualified that assessment, adding that she would need a chair with a high back and lumbar and cervical support, and generous rest periods (up to 15 minutes per hour) (Tr. 1040).

Claimant saw Dr. Iqbal Akhter, a rheumatologist, on November 3, 2003, for evaluation of joint pain and muscle aches. Upon examination, Dr. Akhter found significant crepitation[1] in Claimant's knees with some swelling; her ankles were tender to the touch. Her muscle strength was 5/5 bilaterally, deep tendon relflexes were normal, and her muscles non-tender. He found multiple soft tissue tender points in four quadrants of the body. Her gait was normal. He diagnosed osteoarthritis with "significant crepitation" in the knees. He recommended blood work and knee x-rays (Tr. 943-44). Knee x-rays taken the next day showed no fracture or dislocation, and no significant joint or soft tissue abnormality. Dr. Gulati, radiologist, recorded his impression of the x-rays as a "normal study" (Tr. 981-82).

Claimant saw Physician's Assistant Scott Petersen on December 11, 2003. She complained of pain in the right shoulder, neck, and left shoulder. She reported that Dr. Akhtar and Dr. Evans had diagnosed her with fibromyalgia. Mr. Petersen reported that Claimant "failed to respond to

---

[1]Crepitation is the noise or vibration produced by rubbing bone or irregular degenerated cartilage surfaces together as in arthritis and other conditions. *Stedman's Medical Dictionary* 457 (28th ed. 2006).

4

previous epidural injections through this office," and received no relief from anticonvulsants (Tr. 918).  Examination showed tenderness at the cervical spinous processes and upper trapezius.  He prescribed Flexeril[2] and Tramadol.[3]

Claimant received trigger point injections of lidocaine in her neck at the Southern Illinois Pain Management Center on December 17, 2003, January 7,  14, 21, and 28, February 6 and 11, and March 12, 2004 (Tr. 1026, 1030-35, 1047-52).  On February 10, 2004, she received a diagnostic cervical facet injection.  Claimant saw Physician's Assistant Petersen again on February 18, 2004, for a follow-up on that procedure (Tr. 922).  She reported 90-95% relief.  Examination revealed palpatory tenderness in the cervical spine.  He diagnosed cervical face syndrom and muscle spasm (Tr. 920).  On March 2, 2004, Dr. Juergens performed another diagnostic cervical facet joint injections procedure (Tr. 939-40).  On follow-up, Claimant reported 100% relief (Tr. 935, 1026).

Claimant saw Mr. Petersen again on April 30, 2004, for follow-up on a cervical facet neurotomy procedure.  She complained of increased pain on the left side of her neck.  She reported her level of pain at an eight on a scale from zero to ten.  She had full range of motion in her cervical spine with tenderness to palpitation at the left cervical paraspinal area (Tr. 1025).

Claimant received trigger point injections on July 23 and 26, 2004 (Tr. 1062-64).  She received myofascial release treatments on July 26, 28, and 30, and August 6 and 13, 2004 (Tr. 1065-71).  She received physical therapy on August 23, September 2, 7, 14, 16, 21, and 23, October 12 and 18, 2004 (Tr. 1074-87).  She received additional trigger point injections and myofascial release

---

[2]Flexeril (cyclobenzaprine) is indicated for relief of muscle spasm associated with acute, painful musculoskeletal conditions. *Physicians' Desk Reference* 1833 (60th ed. 2006).

[3]Tramadol (Ultraset) is indicated for short-term management of acute pain. *Physicians' Desk Reference* 2463 (60th ed. 2006).

treatments on October 27 and November 10, 2004, and physical therapy on October 28 and November 4, 2004 (Tr. 1088-99).  At her initial physical therapy evaluation on August 23, 2004, Claimant was able to ambulate on the treadmill for only two minutes at one mile-per-hour with shortness of breath. This was evaluated as "poor endurance" (Tr. 1074).

Dr. Kelly Evans, Claimant's primary care physician who began treating Claimant in 1999 (Tr. 1115) noted in November 2004, "patient is tender to palpation virtually anywhere I touch," including at control points.  At that same appointment, Claimant exhibited a normal gait, normal muscle development, no reproducible bilateral tenderness of the sciatic notch, negative straight-leg raising, and negative Hoffman's reflex.  Dr. Evans found Claimant's complaints peculiar, noting: "The patient has a number of relatively obtuse complaints that I cannot match with any particular noted abnormality.  I still have some questions about her fibromyalgia diagnosis, as well" (Tr. 214).

The medical records also show some history of plantar fascitis.[4]  Claimant received physical therapy for the condition in April and May 2004 (Tr. 726-34).  At a July, 2004 exam, Claimant was "tender beneath feet," but the same exam found her "gait within normal limits" (T 812).  An August, 2004 assessment also determined that Claimant's gait exhibited "no apparent deviations" (T 1074).

Dr. Harry J. Deppe performed a psychological examination of Claimant on July 26, 2004, for the Illinois Bureau of Disability Determination Services ("DDS") (Tr. 805-08).  After consultation, He determined that Claimant's abilities to relate to others, including fellow workers and supervisors, to understand and follow simple directions, and to maintain attention required to perform simple, repetitive tasks were intact, and her ability to withstand the stress and pressures

---

[4]Plantar fascitis is inflamation of the plantar fascia causing foot and heel pain. *Stedman's Medical Dictionary* 706 (28th ed. 2006).

6

associated with day-to-day work activity was adequate.  He diagnosed her with adjustment disorder

with depressed mood and a Global Assessment of Functioning ("GAF") of 60-70.[5]

Dr. Raymond Leung examined Claimant for DDS on July 26, 2004.  She reported her

complaints as fibromyalgia, irritable bowel syndrome, hypothyroidism, and asthma.  He recorded

her medications as Effexor,[6] Flexeril, Thyroid, Klonopin,[7] Dicyclomine,[8] Celebrex,[9] Keppra,[10]

---

[5]A GAF of 60 to 70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) or some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." *Diagnostic and Statistical Manual*, Text Revision 34 (4th ed. 2000).

[6]Effexor (venlafaxine hydrochloride) is indicated for the treatment of major depressive disorder. *Physicians' Desk Reference* 3406 (60th ed. 2006).

[7]Klonopin (clonazepam) is indicated for the treatment of seizure disorders and panic disorder. *Physicians' Desk Reference* 2782 (60th ed. 2006).

[8]Dicyclomine (Bentyl) is indicated for the treatment of irritable bowel syndrome. *Physicians' Desk Reference* 725 (60th ed. 2006).

[9]Celebrex (celecoxib) is indicated for treatment of osteoarthritis and rheumatoid arthritis. *Physicians' Desk Reference* 3131 (60th ed. 2006).

[10]Keppra (levetiracetam) is indicated for the treatment of seizures. *Physicians' Desk Reference* 3308 (60th ed. 2006).

Allegra,[11] Neurontin[12], Zyrtec,[13] Singulair,[14] Flovent,[15] and Albuterol.[16]  Dr. Leung reported that

Claimant's gait was within normal limits; she was able to walk 50 feet unassisted, to heel walk, and

toe walk, but had difficulties squatting.  He noted mild tenderness in the low back, neck, and under

her feet.  He reported crepitation in the right knee and a decreased range of motion in her neck.  He

noted no paralumbar spasms and no difficulty getting on and off the examination table.  Her arm,

leg, and grip strength were normal, and she had no muscle atrophy.  Her lung exam was normal; she

was in no respiratory distress (Tr. 809-12).   Claimant reported to Dr. Leung she could walk "2-3

blocks."  Dr. Leung noted that Claimant wore two-inch heels to the appointment (Tr. 810).

Dr. Deppe examined Claimant for DDS again on January 5, 2005.  He reported her abilities

to relate to others, including fellow workers and supervisors, to understand and follow simple

directions, and to maintain attention required to perform simple, repetitive tasks, and to withstand

the stress and pressures associated with a day-to-day work activity were intact.  He diagnosed

adjustment disorder with mixed emotional features and a GAF of 60-70 (Tr. 152-55).

---

[11]Allegra (fexofenadine hydrochloride) is indicated for the treatment of seasonal allergies. *Physicians' Desk Reference* 2857 (60th ed. 2006).

[12]Neurontin (gabapentin) is indicated for the treatment of neuralgia and epilepsy. *Physicians' Desk Reference* 2498 (60th ed. 2006).

[13]Zyrtec (certirizine hydrochloride) is indicated for the treatment of seasonal allergies. *Physicians' Desk Reference* 2589 (60th ed. 2006).

[14]Singulair (montelukast sodium) is indicated for the treatment of asthma. *Physicians' Desk Reference* 2047 (60th ed. 2006).

[15]Flovent (fluticasone propionate) is indicated for the treatment of asthma.  *Physicians' Desk Reference* 1418 (60th ed. 2006).

[16]Albuterol (Proventil) is indicated for the treatment of bronchospasm. *Physicians' Desk Reference* 3067 (60th ed. 2006).

Dr. Juergens performed cervical epidural steroid injections on January 6, 2005 (Tr. 1100). Claimant reported 30% relief on January 12, 2005 (Tr. 1101).

Claimant saw Dr. Richard George on February 1, 2005, for follow-up on cervical facet nuerotomy performed on January 18, 2005. She reported no significant relief following the procedure. Claimant informed Dr. George that she had a disability hearing in two days and asked for some type of summary documentation she could take with her to the hearing. As Dr. George entered the examination room, Claimant had "at least a dozen pill bottles scattered out on the examination table along with all of her individual daily pill packs spread out on the examination table covering virtually the entire surface of the table." She asked, as she pointed to the medications, "don't you think I'd rather be back at work instead of taking all this?" Claimant complained of headaches and reported her pain at a ten on a scale from zero to ten. Despite her complaints of severe pain, Dr. George reported that she appeared relaxed, calm, pleasant, and in no apparent distress (Tr. 1104-05).

On October 24, 2007, Dr. Kelly Evans, Claimant's primary care physician, filled out a form regarding Claimant's impairments and ability to work (Tr. 1110-14). Dr. Evans reported that Claimant suffers from chronic fatigue syndrome, chronic neck pain, fibromyalgia, anxiety disorder, and major depressive disorder. Dr. Evans opined that Claimant could work only 2 - 3 hours a day. She reported that Claimant could sit for only 30 minutes at a time and stand for only 15 minutes at a time, and that she could not complete an 8-hour workday without an opportunity to lie down or recline for 30 minutes every hour. She opined that Claimant could never climb stairs or a ladder, stoop, reach above shoulder level, and could only occasionally operate foot controls. She determined that Claimant could lift up to 20 pounds occasionally, but could not carry any weight

9

in a competitive work situation.  She reported that Claimant could not work in an environment where she would be exposed to marked changes in temperature or humidity, dust, fumes, or gasses; could not drive automotive equipment, be around machinery, or work at unprotected heights.  She determined that Claimant could push, pull, grasp, and finely manipulate objects on both the left and right, but with pain.  She described Claimant's pain in the shoulders, elbows, hands, wrists, neck, back, and knees as moderately severe and continual with pain levels varying from four to eight on a scale from zero to ten, with an average report of five to six.  She reported that Claimant's pain was precipitated by increased movement, stress, cold, and humidity.  She recorded her medications for pain as Flexeril, Neurontin, Topamax,[17] Ultracet, and Vicodin,[18] and noted that these medications caused drowsiness and dizziness.

Dr. Evans also filed a written narrative in which she stated that Claimant "struggles with basic day to day activities" and spends most of her time in bed.  After minimal activity she must lie down for 30 minutes to 2 or 3 hours.  She does limited housework.  Dr. Evans reported that Claimant's limitations are due to neck pain, "overwhelming fatigue," severe and chronic headaches, and generalized pain over her body concentrated in the neck, shoulders, right arm, back, and knees.  Dr. Evans listed Claimant's impairments as 1) moderate to severe neck pain that persists despite percutaneous facet neurotomy and epidural steroid injections; 2) chronic fatigue syndrome characterized by intermittent sore throat, tender cervical lymph nodes, constant muscle pain, multi-joint pain, headaches, difficulty sleeping, shortness of breath, difficulty concentrating, and limitation

---

[17]Topamax (topiramate) is indicated for the treatment of seizures and migraines. *Physicians' Desk Reference* 2438 (60th ed. 2006).

[18]Vicodin (hydrocodone) is indicated for the treatment of moderate to moderately severe pain. *Physicians' Desk Reference* 530 (60th ed. 2006).

in movement; 3) major depressive disorder with anhedonia, loss of interest in activities, feelings of guilt, excessive sleepiness, difficulty concentrating, slowed thinking, and difficulty performing simple tasks; and 4) fibromyalgia with pain on both sides of her body, with tenderness in 18 of 18 trigger points, loss of balance, visual changes, memory loss, and cognitive loss.  Dr. Evans determined that Claimant is "completely disabled and unlikely to return to a level of function that will allow her to return to any gainful work" (Tr. 1115-19).

Claimant has engaged in many activities since the 2002 punch incident.  Among other things, Claimant has:  driven to Nashville to pick up her significant other and stayed in a hotel there on her own in April 2003 (Tr. 1061); gone out of town in October 2004 (Tr. 1086); worked in her yard picking up sticks and debris in 2005 (Tr. 1106); gone on a motorcycle run in August 2006 (Tr. 1126); cared for her grandchildren over the summer in 2006 (Tr. 1126); and had her in-laws visit for "a couple of weeks"in May and June 2007 (Tr. 1124).  At the ALJ hearing, Claimant also indicated she gardened, managed family finances, dined out, entertained, cared for her daughter, worked on the house and did other projects, did light housework, surfed the internet, and visited friends (Tr. 154, 159, 807, 1127, 1159-60, 1163).

### The ALJ Hearing

Claimant appeared before the ALJ on October 24, 2007.  She was represented by counsel (Tr. 1144).  Also present were Claimant's husband, as an observer, and Lisa Courtney, a vocational expert (Tr. 1146-47).

Claimant testified that her last job was as a food services supervisor at Big Muddy Correctional Center.  In that job, she was on her feet all the time preparing food and observing inmates (Tr. 1150-51).  Prior to that, she worked as a prison guard, an industrial salesperson (in

11

which she was required to carry cases of products and a heavy sample display case), and as a savings counselor at a bank (Tr. 1151-52).

Claimant testified that she experiences constant pain and fatigue. She reported she has "good days" and "bad days," with the bad days outnumbering the good. She has difficulty finishing tasks due to her fatigue. She experiences pain in the neck shoulders and upper back, sometimes radiating into her lower back and down her arms. She rated her pain the day of the hearing at an eight on a scale from one to ten. She stated that on a good day her pain is at a four. She testified that her pain is at an eight half the days in a month. Her pain level averages around a six (Tr. 1164-65). She testified that the pain and fatigue are so severe that she must lie down most of the day about 10 days a month (Tr. 1167). She described her fatigue as "burning," "piercing," and "stabbing" pain (Tr. 1152-53). She testified that lying down is the best relief for the pain but medications also help. She testified she also takes Flexeril, Topamax, Neurontin, Ultracet, and Vicodin for pain relief. She takes Cymbalta for depression, Klonopin for anxiety, and Singulair for asthma (Tr. 1153-55). Claimant testified that the medications make her drowsy and dizzy (Tr. 1166). She reported that she did not believe she could function on a job due to the side effects of the medication (Tr. 1166).

Claimant testified that she can stand for only about 20 minutes at a time, sit for only about 15 minutes, walk a couple of blocks, and lift no more than 15 or 20 pounds with pain (Tr. 1155-56). She testified that she occasionally uses a walking stick on uneven ground (Tr. 1149). She testified that in a typical day she sleeps late and gets up slowly because she wakes up in pain. She gets dressed most days. She tries to do some activity in the mornings but is usually tired and naps after lunch. She watches television, reads the paper and the mail, and checks e-mail or surfs the web (Tr. 1157-59). She testified that her husband does most of the cooking and shopping, and her daughter

vacuums.  She helps with the dishes when she is able (Tr. 1159).  Claimant pays the family's bills and gardens a little bit (Tr. 1160).  She does not exercise regularly.  Claimant testified she is unable to drive due to the pain and stiffness in her neck (Tr. 1162).  She testified that she can no longer participate in activities she used to enjoy, such as raising horses and scuba diving, but she still goes out to dinner with her husband occasionally (Tr. 1163).  Claimant testified that she has gained 55 to 60 pounds since the 2002 punch (Tr. 1149).

Lisa Courtney, a vocational expert, testified at the hearing.  She testified that a hypothetical claimant with the capacity to perform light work, but no repetitive overhead reaching, no concentrated exposure to fumes or chemicals, and with tasks limited to simple one or two steps, would be unable to perform any of Claimant's past relevant work.  Considering Claimant's age of 46, which is considered to be a younger individual, the vocational expert testified, however, that 200,000 jobs exist in Illinois that such a hypothetical claimant court perform.  The vocational expert testified that if a claimant were restricted to sedentary work with the same limitations, there would be about 30,000 jobs, of which 20,000 were sedentary and unskilled.  The vocational expert testified that if Claimant were not able to sustain activity eight hours a day, five days a week, and would be absent from work more than two days a month, there would be no jobs available to her in Illinois (Tr. 1169-72).

### The ALJ's Decision

The ALJ rendered a decision denying disability insurance benefits on December 4, 2007 (Tr. 13-26).  As an initial matter, the ALJ found that Claimant met the insured status requirements of the Social Security Act through December 31, 2009 (Tr. 15).  The ALJ found at step one that Claimant had not engaged in substantial gainful activity since March 7, 2004, the alleged onset date

13

of her disability.  At step two, the ALJ found that Claimant had the medically determinable severe impairments of obesity, asthma, depression, history of cervical fusion, and fibromyalgia.  At step three, however, the ALJ found that Claimant's impairments or combination of impairments did not meet or medically equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, the listing of impairments (Tr. 15).

In making this determination, the ALJ noted Claimant's history of cervical fusion dating back to 1998, but found that there was no evidence of recurrent herniation or significant nerve root compression and that EMG studies from 2003 were "normal with no evidence of cervical radiculopathy" (Tr. 15).  The ALJ considered the effects of Claimant's obesity but found that she retained a full range of motion in her shoulders, elbows, wrists, knees, hips, ankles, and her lumbar spine (Tr. 15-16).  The ALJ also considered Claimant's mental impairments but found that they did not meet or medically equal the criteria listed in 12.04 of the listing of impairments (Tr. 16)

The ALJ found that Claimant retained the Residual Functional Capacity ("RFC") to lift and/or carry 20 pounds occasionally and ten pounds frequently, stand and/or walk around six hours in an eight-hour workday, sit around six hours in an eight-hour workday, and occasionally climb, balance, stoop, kneel, crouch, and crawl.  The ALJ found that the Claimant could do no repetitive overhead reaching and must avoid concentrated exposure to dust, fumes, and gases.  Regarding her mental impairments, the ALJ found that the Claimant had the RFC to perform simple one- or two-step tasks "due to the combined effects of pain and depression" (Tr. 16-17).

The ALJ noted that Claimant takes several medications, including Flexeril, Topamax, Neurontin, Ultracet, Cymbalta, Klonopin, Singular, and Albuterol.  Claimant also lies on her back when she feels pain in order to reduce the symptoms of pain.

14

The ALJ found Claimant's statements regarding her alleged ongoing exertional and nonexertional limitations and their impact on her ability to work "not fully credible." The ALJ explained that the objective medical evidence in the record "does not support the degree of limitations alleged" (Tr. 18).

The ALJ cited a number of inconsistencies. For example, Claimant reported she had lost her ability to work, but she was nevertheless able to garden, make curtains, take care of her grandchildren, and work on her house (Tr. 18-19). Also, when Claimant reported pain of level eight at an appointment with Dr. Miles French in September 2003, she did not appear to be in any distress (Tr. 19). Claimant spoke of her 20-year history of asthma on November 11, 2002, but she had told her doctor in 1998 that she had never suffered from asthma prior to that time. Further, when Claimant sought treatment for the punch injury on October 18, 2002, there was "no evidence of acute abnormalities" (Tr. 19).

At the end of 2003, when she was cleared to return to work following the punch injury, Claimant reported in that a physician had stated she was "faking - symptom magnification" (Tr. 20). Claimant was cleared to do light duty work, but she told personnel at St. Mary's Hospital Behavioral Medicine that she did not feel ready to go back to work (Tr. 20) In November, 2003, Claimant reported to neurologist Dr. Iqbal Akhter that she was working eight-hour shifts as a corrections officer and that she often developed fatigue, shoulder pain, and muscle aches on the job. Dr. Akhter recorded no shortness of breath, no limitation of range of movement, no tenderness. The exam revealed "some crepitation with swelling" in Claimant's knees, but radiographic images of the knees taken the next day revealed no abnormalities, and the report described the knees as "normal" (Tr. 20).

The ALJ noted that Claimant alleged she became unable to work on March 7, 2004.  Dr. Kelly Evans, Claimant's family practitioner, documented Claimant's alleged maladies at the time, including fatigue, migraines, losing items, and reduced concentration due to anxiety over her job (Tr. 20).  The ALJ included Dr. Evans's comments in her report, but discounted some of Dr. Evans opinions because they relied heavily on Claimant's self-reporting (Tr. 23).

At step four, the ALJ found that Claimant could not perform any of her past relevant work (Tr. 24).  Based on Claimant's RFC and the findings of the vocational expert, the ALJ found that there are jobs that exist in significant numbers in the regional and national economy that Claimant could perform, thus, Claimant has not been under a disability from March 7, 2004, through December 4, 2007, the date of the ALJ's opinion (Tr. 26).

## CONCLUSIONS OF LAW

### Standard of Review

Disability insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act.  The Claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of no less than 12 months."  42 U.S.C. § 423(d)(1)(A).  The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing a disability.  20 C.F.R. § 416.920.  The ALJ first considers whether the claimant is presently employed or engaged in "substantial gainful activity."  20 C.F.R. § 416.920(b).  If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or

combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities."  20 C.F.R. § 416.920(c).  Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations.  20 C.F.R. § 416.920(d).  If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling.  *Id*. If, however, the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" ("RFC") and the physical and mental demands of her past work.  20 C.F.R. § 416.920(e).  If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. § 416.920(f).  However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. § 423(d)(2); 20 C.F.R. § 416.920(g).

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."); *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003); *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001); *See also White v. Barnhart*, 415 F.3d 654, 659 (7th Cir. 2005) ("the reviewing court is not allowed to substitute its judgment for the ALJ's by reconsidering facts, reweighing evidence, resolving conflicts in evidence, or deciding questions of credibility" (citation and quotation marks omitted)).  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1972)

(quoting *Consolidated Edison Co. V. NLRB*, 305 U.S. 197, 229 (1938)).  *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002); *Green v. Shalala*, 51 F.3d 96, 101 (7th Cir. 1995).  An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law.  *Golembiowski*, 32 F.3d at 915; *Cannon v. Apfel*, 213 F.3d 970, 974 (7th Cir. 2000).

This deferential standard applies, *inter alia*, to findings of the claimant's credibility. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001) ("The ALJ's credibility determinations generally will not be overturned unless they were patently wrong.").  However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez ex. rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003); *Carradine v. Barnhart*, 360 F.3d 751, 756 (7th Cir. 2004) (stating that "an administrative agency's decision cannot be upheld when the reasoning process employed by the decision maker exhibits deep logical flaws") .

An ALJ need not address every objective finding in the record, however, for his judgment to be supported by substantial evidence.  The ALJ "need only build a bridge from the evidence to his conclusion." *Sims v. Barnhart*, 309 F.3d 424, 429 (7th Cir. 2002) (quoting *Green v. Apfel*, 204 F.3d 780, 781 (7th Cir. 2000).

### *ALJ's Evaluation of Plaintiff's Medical History*

Claimant alleges the ALJ committed error by omitting evidence of Claimant's medical history which led to a flawed RFC determination.

**History of Cervical Fusion.**  Claimant first addresses the history of cervical fusion (Doc.17 at 4).  The ALJ noted MRI tests performed on January 7, 2003, and February 26, 2003, as well as a CT scan done on March 19, 2003.  Claimant acknowledges that the ALJ considered these tests and that the tests showed no nerve root impingement (*Id.*)  Claimant alleges the ALJ committed error

18

by failing to consider the January 28, 2003, MRI.  The Seventh Circuit does not require an ALJ "to address every piece of evidence or testimony in the record." *Zurawski*, 245 F.3d at 889.  Rather, the Seventh Circuit allows "a commonsensical reading" of a claimant's medical history, "rather than nitpicking at it." *Johnson v. Apfel*, 189 F.3d 561, 564 (7th Cir. 1999).

Claimant argues that it is "clear error" that the ALJ did not note the "compromise of the C4 nerve root on the right (partial compromise)" from the January 28, 2003, MRI.  (Doc. 17 at 4).  The ALJ did not mention the January 28, 2003, MRI explicitly, but did refer (in the plural) to MRI and EMG studies extending from several weeks before the January 28, 2003, test to several weeks after that test.  (Tr. 18).  The ALJ addressed the root compromise issue by noting that these tests "did not note significant nerve root compression" (Tr. 18).  The ALJ also referred to radiographic images of the claimant's cervical spine obtained on January 7, 2003, which revealed "fairly 'normal' anatomical alignment and only 'mild' anterior spurring at the anterior inferior aspect of C3" (Tr. 19). The ALJ noted "normal" EMG studies performed on January 27, 2003, and a February 26, 2003, radiographic image which "revealed narrowing of the neural foramina at C3-4 , but there was no evidence of herniation or nerve root compression." (Tr. 19).  As Defendant points out, the lack of "significant" nerve root compression is consistent with Claimant's description of the January 28, 2003, MRI as exhibiting "partial compromise" of the nerve root.  (Doc. 20 at 6).  Furthermore, the ALJ not only acknowledged the existence of Claimant's nerve root compression, she also accounted for the nerve root compression and associated pain by limiting Claimant to light work with no repetitive overhead reaching in determining the RFC (Tr. 17).

In determining a claimant's RFC, an ALJ must consider "all of the relevant medical and other evidence," including the claimant's own descriptions and observations of his limitations.  20

C.F.R. § 404.1545(a)(3).  Such other evidence for the ALJ's consideration  includes: (1) the claimant's daily activities; (2) the location, duration, frequency, and intensity of pain and symptoms; (3) factors that precipitate and aggravate the claimant's symptoms; (4) the type, dosage, and effectiveness of medications; (5) the claimant's treatment other than medication; (6) any measures the claimant has used to relieve his pain or symptoms; and (7) other factors concerning the claimants functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); *Knight v. Chater*, 55 F.3d 309, 314 (7th Cir. 1995).

The undersigned finds the ALJ's discussion of the evidence evaluated in determining Plaintiff's RFC is based on substantial evidence on the record as a whole, particularly when considering the ALJ's determination that Claimant's reports of pain were not consistent with the objective medical evidence, undermining her credibility.

**Obesity.**  Claimant also points out that although the ALJ stated that one of Plaintiff's severe impairments was obesity, the ALJ did not consider that impairment in evaluating her disability (Doc. 17 at 5).  An ALJ must consider a claimant's condition "as a whole" when the claimant presents numerous medical problems. *Sienkiewicz v. Barnhart*, 409 F.3d 798, 802 (7th Cir. 2005).  Obesity in particular should be considered in combination with all a claimant's impairments. *Id.*  The ALJ found that despite her obesity, Claimant still exhibited a full range of motion in her shoulders, elbows, wrists, knees, hips, ankles, and lumbar spine. Although the ALJ's discussion of Claimant's obesity was slight, there is no evidence in the record to suggest that the ALJ disregarded Claimant's obesity in her evaluation of the Claimant's impairments. *See Sienkiewicz*, 409 F.3d at 802.  None of her treating or examining physicians reported her obesity as a limiting factor.  The undersigned recommends, therefore, that the ALJ's failure to discuss further Claimant's obesity is not reversible

20

error.

**Foot and Knee Impairments.**  Claimant argues that the ALJ failed to consider her feet and knee problems as "severe impairments" in determining her RFC.  At step two, the ALJ is to determine whether a claimant's impairments are severe.  A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c).  Courts have held that after the ALJ has proceeded beyond step two by finding that at least one claimed impairment is "severe," the ALJ's failure to find an additional impairment severe is not "reversible error." *Curtis v. Astrue*, 623 F.Supp.2d 957, 968 (S.D. Ind. 2009).  After step two "the ALJ's classification of an impairment as 'severe' or 'not severe' is largely irrelevant" because the ALJ still must consider all of the claimant's impairments in determining the RFC. *Id.* *See also Golembiewski v. Barnhart*, 322 F.3d 912, 918 (7th Cir. 2003) (holding that ALJ must consider the combined effect of all of the claimant's medical problems, even "impairments that in isolation are not severe").  In other words, as long as the ALJ considers all of the claimant's medical impairments, his or her failure to designate a particular impairment as "severe" at step two is not a fatal error.

The ALJ considered that in July 2004 Claimant exhibited a full range of motion in her knees and ankles (Tr. 16); that in November 2003, Dr. Akhter noted some crepitation with swelling in the Claimant's knees, but radiographic images of her knees were normal (Tr. 20); that a state-appointed physician found that Claimant was "mildly tender" under her feet, with crepitation and a decreased range of motion in the right knee, but her leg strength was normal (Tr. 22); and in August 2004 she was "ambulating without an assistive device."  As stated above, the ALJ further found that Claimant's reports of pain were not fully credible.  Based on these findings, the Court believes that

the ALJ properly considered the Claimant's knee and foot impairments in determining the RFC, despite her failure to find either of these impairments "severe" at step two of the five-step evaluation process.

### *ALJ's Evaluation of Claimant's Pain*

Claimant argues that the ALJ made an erroneous credibility determination regarding Plaintiff's allegations of pain and her analysis did not provide a rational basis for the denial of benefits. Claimant argues specifically that the ALJ did not properly evaluate Claimant's statements regarding "good days" and "bad days," did not consider Plaintiff's medications and side effects, nor the objective evidence supporting her allegations of pain (Doc. 17, pp. 6-8).

As stated above, the Court must evaluate the ALJ's findings of the Claimant's credibility under a highly deferential standard. *Zurawski*, 245 F.3d at 887. "No symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical or mental impairment(s) that could reasonably be expected to produce the symptoms." S.S.R. 96-7p.

According to the Seventh Circuit,

If the allegation of pain is not supported by the objective medical evidence in the file and the claimant indicates that pain is a significant factor of his or her alleged inability to work, then the ALJ must obtain detailed descriptions of claimant's daily activities by directing specific inquiries about the pain and its effects to the claimant. She must investigate all avenues presented that are related to pain, including claimant's prior work record information and observations by treating physicians, examining physicians, and third parties. Factors that must be considered include the nature and intensity of claimant's pain, precipitation and aggravating factors, dosage and effectiveness of any pain medications, other treatment for the relief of pain, functional restrictions, and the claimant's daily activities.

*Id.* (quoting *Luna v. Shalala*, 22 F.3d 687, 691 (7th Cir. 1994)). The *Zurawski* court, however,

clarified that "where the medical signs and findings reasonably support a claimant's complaint of pain, the ALJ cannot merely ignore the claimant's allegations." *Zurawski,* 245 F.3d at 887-88.

The ALJ's determination that Claimant's claims of pain were not entirely credible is based upon substantial evidence on the record as a whole.  The ALJ analyzed Claimant's testimony regarding her "constant fatigue" and "chronic pain that radiates from her neck into her shoulders, upper back, and arms and prevents her from completing tasks."  The ALJ noted the Claimant's statements that she experiences "muscle spasms, a burning sensation, and stabbing pain." The ALJ reported that on a "bad day" Claimant rated her pain as an eight on a scale from zero to ten, and on a "good day" Claimant rated her pain at a four.  She reported that she has bad days fifty percent of the time and lies down most of the day for ten days in a month.  Claimant's pain is relieved by lying down and taking medication.  Regarding Claimant's daily activities, the ALJ noted that Claimant tries to straighten the house on some days, dresses on most days, reads the mail and the newspaper, and uses a computer.  She manages the money and pays the bills for her family, does some gardening, goes out to dinner with her husband, and visits with friends who stop by (Tr. 18).  The ALJ listed Claimant's medications as Flexeril, Topomax, Neurontin, Ultraset, Cymbalta, Klonopin, Singulair, and Albuterol.  These medications cause her to be drowsy, dizzy, and have difficulty concentrating.

The ALJ found that Claimant's "statements concerning the severity and extent of her alleged ongoing exertional and nonexertional limitations and their impact on her ability to work are not fully credible.  Although the Claimant has numerous subjective complaints, the objective medical evidence contained in the record does not support the degree of limitations alleged" (Tr. 18).  The ALJ then summarized the medical records that belie Claimant's reports of pain.  The ALJ pointed

to MRI and EMG studies have not revealed significant nerve root compression that would account for her reported level of pain, and radiographic images of the cervical spine have showed "normal anatomic alignment" with only "mild anterior spurring."  Although studies have shown narrowing of the neural foramina, it was revealed to be only "slight" with no herniation or nerve root compression (Tr. 19).  Her self-reports of asthma have been inconsistent, and the impairment found to be only "mild" in objective studies.  As noted above, the ALJ briefly discussed the tenderness in her feet, and crepitation in her right knee.  The ALJ also summarized the reports of examining physicians Dr. Leung, Dr. Deppe, and of treating physician Dr. Evans.

Considering the deferential standard by which the Court is to review an ALJ's credibility finding, the Court believes that the ALJ's thorough discussion of the medical records, and of the other factors related to Claimant's pain was adequate to support her credibility finding.  Thus, the undersigned recommends that the ALJ's opinion as to Claimant's credibility is based upon substantial evidence on the record as a whole.

### ALJ's Evaluation of Claimant's Fatigue

Claimant argues that the ALJ improperly discounted a treadmill test that indicated Claimant's endurance was poor and did not evaluate her endurance in relation to Claimant's fibromyalgia and her "good days" and "bad days."

As stated above, an ALJ need not examine every piece of evidence presented in the record, but must only build a bridge from evidence to conclusion.  The ALJ discounted as not fully credible Claimant's claims of fatigue in the same way she discounted Claimant's statements of pain, discussed above.  The Claimant testified that she experiences "constant fatigue," that her medications cause drowsiness, and that she lies down most of the day ten days a month.  The ALJ

24

found these subjective complaints not fully credible because she has continued to engage in activities including "gardening, working on her house, making curtains, taking care of her grandchildren, entertaining guests, and managing the family's finances" (Tr. 19).   The ALJ discussed the statements of her treating physician Dr. Kelly Evans in March 2004, that Claimant was "exhausted all the time," and in October 2007, that Claimant had reported worsening fatigue, spent most of her time in bed, and had to lie down from 30 minutes to 2-3 hours after minimal activity (Tr. 20, 23).   The ALJ discounted those conclusions because they were "heavily reliant upon the claimant's self-report" (Tr. 23).   Regarding Claimant's depression, the ALJ discounted Dr. Evans's opinion in favor of specialist Dr. Deppe, a psychiatrist.   Finally, the ALJ discounted some of Dr. Evans's conclusions because they were not supported by her own progress notes (Tr. 24).   The ALJ did report the Claimant's "poor endurance"on the treadmill test, but interpreted the result as evidence of her mild breathing difficulties, not of fatigue.   While it may be that the ALJ should have discussed the treadmill test in terms of Claimant's reports of fatigue, the undersigned does not believe that the ALJ's failure to do so undermines the credibility finding as to Claimant's claims of pain and fatigue.   As discussed above, the ALJ's credibility finding, which is due significant deference, is supported by the record as a whole.   Furthermore, an ALJ is not required to discuss every piece of evidence in the record, so long as she builds a bridge from evidence to conclusion. The undersigned recommends that the ALJ here did build such a bridge in her determination of Claimant's credibility.

**CONCLUSION**

Based on the foregoing, the Court **RECOMMENDS** that Claimant has failed to demonstrate that the ALJ's decision was not supported by substantial evidence or that she committed an error of

law. It is therefore **RECOMMENDED** that Claimant's petition be **DENIED**, that judgment be entered in favor of the Commissioner, and that the Court adopt the foregoing findings of fact and conclusions of law.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 73.1(b), the parties shall have fourteen (14) days after service of this Recommendation to file written objections thereto.  The failure to file a timely objection may result in the waiver of the right to challenge this Recommendation before either the District Court or the Court of Appeals.  *Snyder v. Nolen*, 380 F.3d 279, 284 (7th Cir.2004); *United States v. Hernandez-Rivas*, 348 F.3d 595, 598 (7th Cir. 2003).

**DATED: February 1, 2010**


                                        s/ *Donald G. Wilkerson*
                                        **DONALD G. WILKERSON**
                                        **United States Magistrate Judge**